Filed 3/25/26  P. v. Superior Court (C.S.) CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF TULARE COUNTY,<br><br>Respondent;<br><br>C.S.,<br><br>Real Party in Interest. | F090563<br><br>(Super. Ct. No. JJD059342)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Sylvia J. Hanna, Judge.

Tim Ward, District Attorney (Tulare), Dan Underwood, Chief Deputy District Attorney, and Adam Clare, Assistant District Attorney, for Petitioner.

No appearance for Respondent.

Sandra Gillies, under appointment by the Court of Appeal, for Real Party in Interest.

-ooOoo-

This matter is before the court following denial of the People's motion to transfer real party in interest C.S. to criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).)[1] The People filed a petition for writ of mandate claiming the juvenile court abused its discretion when it denied their transfer motion, based on its misunderstanding and misapplication of the law. (Cal. Rules of Court, rule 5.770(g)(2).)[2] The People request that this court direct the juvenile court to vacate its order and either grant their transfer motion or hold another transfer hearing. C.S. argues this court lacks jurisdiction over the People's petition because it was not timely filed and, on the merits of the People's claims, no errors occurred.

For the reasons set forth below, we deem the People's petition timely filed based on its date of submission to this court for filing, but we reject the People's claim that the juvenile court erred in denying their transfer motion. Therefore, the petition for writ of mandate is denied.

## BACKGROUND AND PROCEDURAL HISTORY[3]

**I.      *See I***

In 2006, when C.S. was 16 years old, he and four other males approached 16-year-old Robert Trevino in the street. C.S. and his group were members of the Oriental Troops gang. Trevino was a rival Norteño gang member. One of the individuals with C.S. shook hands with Trevino and pointed. As Trevino turned to look, C.S. shot him in the head from three or four feet away.

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

[2]     All further undesignated rule references are to the California Rules of Court.

[3]     We take judicial notice of our prior nonpublished opinions in *People v. See* (Dec. 18, 2009, F055800) (*See I*), *People v. See* (Apr. 3, 2018, F075084) (*See II*), *People v. See* (Sept. 23, 2021, F079261) (*See III*), and *People v. C.S.* (Mar. 13, 2024, F085426) (*C.S.*); and we take judicial notice of the record in *C.S.*, which contains Dr. Weinstein's 2015 report prepared in advance of C.S.'s 2016 resentencing hearing. (Evid. Code, §§ 452, subd. (d), 459.)

2.

In 2008, C.S. and two group members were tried for Trevino's murder.[4] C.S. was convicted of murder (Pen. Code, § 187, subd. (a)) and conspiracy to commit murder (*id.*, §§ 182/187, subd. (a)), and the jury found the special circumstance allegation and the gang and firearm enhancements true (*id.*, §§ 190.2, subd. (a)(22), 186.22, subd. (b)(1), 12022.53, subds. (d). (e)(1)). The trial court sentenced C.S. to life without the possibility of parole (LWOP) for murder with an additional term of 25 years to life for the firearm enhancement.

C.S. appealed and in 2009, in *See I*, a panel of this court ordered a correction to the abstract of judgment but affirmed the judgment. The California Supreme Court denied C.S.'s petition for review.

## II.    *See II*

In 2016, following the United States Supreme Court's decisions in *Miller* and *Montgomery*, C.S. filed a habeas petition in the trial court seeking relief from his LWOP sentence. (*Miller v. Alabama* (2012) 567 U.S. 460, 465 (*Miller*) [holding "mandatory [LWOP] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'"]; *Montgomery v. Louisiana* (2016) 577 U.S. 190, 212 (*Montgomery*) [*Miller* announced a substantive rule of constitutional law that applies retroactively].) The trial court granted the petition in May 2016 and, in November 2016, voters enacted Proposition 57 (as approved by voters, Gen. Elec. (Nov. 8, 2016) (Proposition 57)). In December 2016, the trial court resentenced C.S. to 25 years to life for murder with an additional term of 25 years to life for the firearm enhancement.

C.S. appealed, claiming his sentence was the functional equivalent of LWOP and violated the Eighth Amendment. In supplemental briefing, C.S. requested remand to

---

[4]    A third member of the group pleaded to a voluntary manslaughter charge and testified for the prosecution.

allow the trial court to consider whether to strike the firearm enhancement pursuant to Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620), effective January 1, 2018. In *See II*, decided in 2018, this court rejected C.S.'s constitutional challenge to his sentence of 50 years to life, but remanded the matter to allow the trial court to exercise its discretion under Senate Bill 620.

## III.    *See III*

On remand, the trial court declined to strike the firearm enhancement and C.S. appealed.  He claimed the trial court erred by not referring him to juvenile court for a transfer hearing in light of Proposition 57.  In addition, he claimed that in failing to take the *Miller* factors and his postconviction conduct into account, the trial court abused its discretion when it declined to strike the firearm enhancement.  Finally, he sought remand for a *Franklin* hearing.  (*People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).)

In 2021, in *See III*, this court concluded that because C.S.'s sentence was vacated and he was resentenced, judgment was not final within the meaning of *Estrada* and he was entitled to remand for a transfer hearing under Proposition 57.  (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*); see *People v. Padilla* (2022) 13 Cal.5th 152, 158 [subsequently holding same].)  We also concluded that the trial court failed to exercise informed discretion when it denied C.S.'s request for relief under Senate Bill 620, necessitating remand.  Finally, although C.S. had an opportunity to make a record under *Franklin* and, therefore, would not have been entitled to remand solely on that ground, our resolution of his other claims rendered this request for relief moot.

## IV.    *C.S.*

In his fourth appeal, C.S. challenged the juvenile court's decision granting the prosecution's motion to transfer him to a court of criminal jurisdiction.[5]  C.S. argued the court's findings were not supported by substantial evidence, and the court treated

---

[5]    The Honorable Hugo J. Loza.

4.

amenability to rehabilitation as merely a factor, did not make an adequate record of its reasoning, relied on the fact C.S. would be released if the transfer motion was denied given the absence of jurisdiction over C.S. based on his age, and refused to consider his rehabilitative efforts in prison. The People argued the court considered all five factors under section 707, subdivision (a)(3)(A)–(E), and that the court's findings on the factors supported its determination that C.S. could not be rehabilitated prior to expiration of juvenile court jurisdiction.

Following our review of the briefs, we granted the parties an opportunity to brief the issues of retroactivity in light of Assembly Bill No. 2361, Senate Bill No. 545, and Senate Bill No. 135.[6] The parties agreed that the bills applied retroactively, and the Attorney General did not oppose remand for a new transfer hearing. We concluded that given the retroactive changes to sections 707 and 607, C.S. was entitled to remand for a new transfer hearing that comported with the law as amended.

## V. Petition for Writ of Mandate

On remand, the juvenile court held a new transfer hearing.[7] The court denied the prosecution's transfer motion after finding the prosecution failed to meet its burden of demonstrating, by clear and convincing evidence, that C.S. is not amenable to rehabilitation while under the jurisdiction of the juvenile court (§ 707, subd. (a)(3)), which for persons 25 years or older now extends for up to two years from the date of disposition (§ 607, subd. (d)).

The People filed the petition for writ of mandate currently before this court, requesting that we vacate the juvenile court's order denying their transfer motion and

---

[6]     Assembly Bill No. 2361 (2021–2022 Reg. Sess.) (Assembly Bill 2361), effective January 1, 2023; Senate Bill No. 545 (2023–2024 Reg. Sess.) (Senate Bill 545), effective January 1, 2024; Senate Bill No. 135 (2023–2024 Reg. Sess.) (Senate Bill 135), effective September 13, 2023.

[7]     The Honorable Sylvia J. Hanna.

either grant the motion or hold a third transfer hearing. (Rule 5.770(g)(2).) The People do not advance a substantial evidence challenge. Instead, they claim the juvenile court abused its discretion as follows: the court misunderstood this court's opinion remanding the matter for a new transfer hearing, conflated the issues of its jurisdiction over C.S. with the issue of availability of rehabilitative programs to treat C.S., and applied the wrong legal standard when it determined they failed to meet their burden of showing C.S. is not amenable to rehabilitation while under the jurisdiction of the juvenile court.

This court issued an order to show cause and set a briefing schedule.

C.S. responds that we lack jurisdiction over the People's petition because it was not timely filed, and he disputes the People's claims of error.

Discussed next, we conclude the petition was timely filed and we find no error with the juvenile court's ruling. Accordingly, we discharge the order to show cause and deny the petition for writ of mandate.

## DISCUSSION

### I.     Timeliness of Petition

Rule 5.770(g)(2) provides, "An order denying a motion to transfer jurisdiction of a youth to the criminal court is not an appealable order. Appellate review of the order is by petition for extraordinary writ. Any petition for review of a judge's order denying a motion to transfer jurisdiction of the child to the criminal court, or denying an application for rehearing of the referee's determination not to transfer jurisdiction of the child to the criminal court, must be filed no later than 20 days after the judge's order is entered, or the referee's order becomes final under rule 5.540(c)." In this case, the juvenile court denied the People's transfer motion on September 17, 2025, and the People filed their petition for writ of mandate on October 8, 2025. C.S. argues this court lacks jurisdiction over the petition because it was filed 21 days after the transfer motion was denied. The People contend the petition should be deemed timely filed because it was submitted for filing on

6.

October 7, 2025, but rejected for technical defects under rule 8.74.[8]  On October 8, 2025, when the People received notice from the clerk's office that the filing was rejected for noncompliance with rule 8.74, they promptly cured the defect and resubmitted the petition for filing within several hours.[9]

C.S.'s claim that we lack jurisdiction over the People's petition because it was not timely filed raises two possibilities.  (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 339 *(Kabran)*.)  "'A lack of *fundamental* jurisdiction is ""'"an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties."'"'"  [Citations.]  Because a lack of fundamental jurisdiction implicates 'the basic power of a court to act,' courts must enforce jurisdictional limitations even if considerations of waiver, estoppel, consent, or forfeiture might otherwise excuse a party's failure to comply with them."  (*Law Finance Group, LLC v. Key* (2023) 14 Cal.5th 932, 949–950, italics added (*Law Finance Group*).)  "[W]hen a party fails to comply with a jurisdictional time bar, the court has no choice but to dismiss the case for lack of

---

[8]  "'Electronic filing' means the electronic transmission to a court of a document presented for filing in electronic form.  For purposes of this section, this definition of electronic filing concerns the activity of filing and does not include the processing and review of the document and its entry into the court's records, which are necessary for a document to be officially filed."  (Code Civ. Proc., § 1010.6, subd. (a)(1)(D).)

[9]  The People do not argue in their letter brief that there was a failure in the electronic transmission and receipt of the petition, but, during oral argument, they cited *Garg* and invited this court to consider their brief to be a motion under rule 8.77(d).  (*Garg v. Garg* (2022) 82 Cal.App.5th 1036, 1051 (*Garg*) ["[W]e treat appellants' motion filed in the trial court and the opposition papers filed here as satisfying the obligation to file a motion in this court under rule 8.77(d).  The law was not clear prior to this opinion and it would be unfair to dismiss the appeal merely because appellants filed their motion for relief in the trial court."].)  We decline to do so.  They did not raise the issue by filing a motion with their petition, as required by the rule, and there is no evidence any failure occurred in the electronic transmission and receipt of the petition.  (Rule 8.77(d) ["If a filer fails to meet a filing deadline imposed by court order, rule, or statute because of a failure at any point in the electronic transmission and receipt of a document, the filer may file the document on paper or electronically as soon thereafter as practicable and accompany the filing with a motion to accept the document as timely filed."].)

jurisdiction, even if equitable concerns would support reaching the merits." (*Id.* at p. 950.)

C.S. does not claim we lack fundamental jurisdiction and we agree. Given the "harsh consequences" that result from an absence of fundamental jurisdiction, courts "apply a 'presumption that statutes do not limit the courts' fundamental jurisdiction absent a clear indication of legislative intent to do so.'" (*Law Finance Group, supra*, 14 Cal. 5th at p. 950.) "'Even when a court has fundamental jurisdiction, however, the Constitution, a statute, or relevant case law may constrain the court to act only in a particular manner, or subject to certain limitations.'" (*Kabran, supra*, 2 Cal.5th at p. 339.) "'There are many time provisions, e.g., in procedural rules, that are not directory but mandatory; these are binding, and parties must comply with them to avoid a default or other penalty. But failure to comply does not render the proceeding void' in a fundamental sense." (*Id.* at p. 341.) It is the absence of what is sometimes referred to as "'ordinary' jurisdiction" which is at issue here, by virtue of the People's alleged failure to comply with the 20-day filing deadline. (See *People v. Chavez* (2018) 4 Cal.5th 771, 780 [actions that exceed constraints imposed by statute, Constitution or common law are "ordinary act[s taken] in excess of jurisdiction"]; *In re Whalen* (2025) 111 Cal.App.5th 1195, 1204.)

Under some circumstances, courts have deemed filings timely where the filing was timely submitted but rejected for a technical reason. (*Lazar v. Bishop* (2024) 107 Cal.App.5th 668, 676 (*Lazar*); *Garg, supra*, 82 Cal.App.5th at p. 1045.) We recognize, as C.S. contends, that some of these cases involved what the reviewing court determined was the wrongful rejection of the filing by the court clerk.[10] (E.g., *Voit v. Superior Court*

---

[10] However, in *United Farm Workers of America v. Agricultural Labor Relations Bd.* (1985) 37 Cal.3d 912, the California Supreme Court was not persuaded by the petitioner's claim that the deputy clerk properly rejected the filing under rule 8.18, formerly rule 46, for lack of verification. (*United Farm Workers, supra*, at p. 918.) Although the omission was arguably a technical defect within the clerk's scrutiny under rule 8.18, the court nevertheless concluded the

(2011) 201 Cal.App.4th 1285, 1287; *Rojas v. Cutsforth* (1998) 67 Cal.App.4th 774, 776–777; *Rapp v. Golden Eagle Ins. Co.* (1994) 24 Cal.App.4th 1167 1172–1173.) Here, in contrast, the rules provide, "Unless otherwise provided, a document is deemed filed on the date it is received by the court clerk" (rule 1.20), but "[e]xcept as these rules provide otherwise, the reviewing court clerk must not file any record or other document that does not conform to these rules" (rule 8.18), and the People's petition was rejected for a formatting error under rule 8.74. Specifically, the exhibits to the petition exceeded the limit of 300 pages per volume, requiring that they be separated into volumes not exceeding 300 pages. (*Id.*, (a)(5).)

C.S. argues that the decision in *Lazar*, in which a notice of appeal was timely submitted but rejected for a technical defect, is materially distinguishable. In that case, the filing party failed to select the proper category from the electronic filing menu and the filing was rejected. (*Lazar, supra*, 107 Cal.App.5th at p. 676.) The appellate court was not persuaded by the defendants' position that "'the untimely filing is "not remediable"'" since it was not caused by a technical problem with the filing system but rather by counsel's mistake." (*Ibid.*; see rule 8.77(d).) The court deemed the notice of appeal timely filed because it was submitted "before the filing deadline, the superior court rejected it due to a technical issue with the electronic filing, and [the] plaintiff's counsel promptly refiled the notice of appeal the same day counsel received the superior court's rejection of the original filing." (*Lazar, supra*, at p. 676.)

"[M]andatory procedural rules [unquestionably] serve important policy goals" (*Law Finance Group, supra*, 14 Cal.5th at p. 950), but there is nevertheless "'"a preference for the resolution of litigation and the underlying conflicts on their merits by

---

brief was timely filed because it was delivered to the clerk's office within time limits. (*United Farm Workers, supra*, at p. 918.) The court noted that cases relied on by the petitioner to support its argument for strict compliance did not involve a filing that was timely but defective in form. (*Id.* at pp. 916–917.)

the judiciary"'" (*ibid.*, quoting *Kabran, supra*, 2 Cal.5th at pp. 342–343).  It is undisputed that the People's petition was timely submitted for filing, it was rejected the next morning for a technical formatting error, and the People promptly corrected the error that morning, resulting in a filing date that fell on the 21st day.  (See rule 5.770(g)(2).)  The error in question did not affect the substance or the merits of the petition, and there is no support for even an intimation that the People engaged in gamesmanship; they did not obtain any advantage from their error and C.S. was not prejudiced by the error.  We are unpersuaded that this class of de minimis technical error, which does not affect our fundamental jurisdiction over the matter, should preclude consideration of the People's timely submitted petition on the merits.  (See *City of Salinas v. Workers' Comp. Appeals Bd.* (2025) 113 Cal.App.5th 801, 824, review granted, Nov. 19, 2025, S293212 ["A procedural deadline that is mandatory but does not clearly limit the fundamental authority of the court … over the subject matter or the parties may remain subject to judiciously applied equitable exceptions if the court retains fundamental jurisdiction."].)  Under the circumstances presented here, dismissal of the petition for untimeliness is not warranted. We deem the petition filed on October 7, 2025, the date it was submitted to this court for filing.

## II.     Denial of Transfer Motion

### A.     Legal Principles

 "We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 165 (*Miguel R.*).)  "'The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo.  [Citation.]  A decision based on insufficient evidence or the court's "'erroneous understanding of applicable law'" is subject to reversal.  [Citation.]' (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 187.)  But … we do not reweigh the evidence and we do not substitute our discretion for the discretion exercised by the trial court." (*In re J.S.* (2024) 105 Cal.App.5th 205, 211 (*J.S.*).)  "[W]e draw all

reasonable inferences in support of the court's findings, not against them." (*Miguel R., supra*, at p. 169.) "We … are concerned only with whether ""'the circumstances reasonably justify the trier of fact's findings."'" [Citation.] When evidence reasonably justifies the trier of fact's findings, "'the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'" (*Ibid.*)

"The ultimate question for the juvenile court in a transfer petition is whether a minor is amenable to rehabilitation before the juvenile court's jurisdiction expires. (§ 707, subd. (a)(3); *In re E.P.* (2023) 89 Cal.App.5th 409, 416.) To order a minor's transfer to a court of criminal jurisdiction, the juvenile court must 'find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' (§ 707, subd. (a)(3).)

"In making that determination, the juvenile court must consider five specific factors: (1) '[t]he degree of criminal sophistication exhibited by the minor' (§ 707, subd. (a)(3)(A)(i)); (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (*id.*, subd. (a)(3)(B)(i)); (3) '[t]he minor's previous delinquent history' (*id.*, subd. (a)(3)(C)(i)); (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (*id.*, subd. (a)(3)(D)(i)); and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (*id.*, subd. (a)(3)(E)(i)).

"The statute also sets forth a nonexhaustive list of relevant factors for the juvenile court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) If the juvenile court orders a transfer to criminal court, it must 'recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' (*Id.*, subd. (a)(3).)" (*J.S., supra*, 105 Cal.App.5th at p. 212.) In moving for an order transferring the minor to

criminal court, "[t]he prosecution bears the burden of proving by clear and convincing evidence that the minor is 'not amenable to rehabilitation while under the jurisdiction of the juvenile court.'"  (*Miguel R., supra*, 100 Cal.App.5th at p. 167.)

**B.        Summary of Transfer Hearing**

**1.        Witness Testimony**

**a.        Prosecution Evidence**

The People called five witnesses to testify concerning in-custody incidents involving C.S. that occurred between 2007 and 2018.  In December 2007, C.S. and two other individuals escaped from a probation officer during transportation to the courthouse in Visalia.  They were located approximately one-quarter of a mile away hiding in a shed.  C.S. had a handcuff key on him, and he had one tattoo associated with the Oriental Troops, a Visalia street gang.

In April 2014, C.S. received an informational chrono for wearing a metal bracelet that he was not authorized to have.  The bracelet was confiscated by a correctional officer, who testified there were no consequences and the chrono was not disciplinary in nature.

In February 2017, C.S. received a rules violation report for overfamiliarity after he loudly said to a female staff member, "'mmm, mmm, mmm, it must be my lucky day today, I get to see her twice today.  I should go buy me a lotto ticket because I will probably hit the jackpot, mmm, mmm.'"  The staff member testified he licked his lips when he said it, and she felt very uncomfortable and sexually harassed.

In May 2018, C.S. received a rules violation report after a cellphone was found hidden in a typewriter.  His name and identification number were engraved on the phone, and he admitted it was his.  The officer who confiscated the phone did not have any independent recollection of the incident because it was not that unusual of an occurrence.

### b. Defense Evidence

### 1) GRIP Program[11]

Mark Morales testified he is employed by the GRIP Training Institute, a nonprofit that works with seven prisons providing a highly intensive 13–14 month program that focuses on five tenets he described as follows: cultivating mindfulness, developing emotional intelligence, stopping your violence and doing no harm, understanding victim and survivors impact thoroughly, and giving back to your community. Morales became involved with the program as a student in 2016, when he was incarcerated, and at the time of his testimony, he had been out of prison just over five years. In 2024, C.S. was one of 40 students in the first cohort at SATF (Substance Abuse and Treatment Facility), where Morales is the prison lead. C.S. completed the program in 2025.

Morales testified that GRIP is not a superficial program, and it requires participants to engage in deep emotional work, taking full accountability and responsibility so that their crimes do not happen again. Participants must be open and able to talk about their controlling cases and any criminal or destructive behaviors, and because the program is a privilege, participants are removed if they are subject to disciplinary action. The goal of the program is to transform participants into safe, strong men, and if participants do not reach that goal, they do not graduate. Morales estimated that per yard, at least 200 inmates apply and 150–160 are then interviewed for 30–35 available places in the program. The program entails 13 eight–nine hour monthly classes, meetings with inside facilitators at least once a week, and extensive homework and feedback. The program also works with a researcher to quantify results, San Diego University has reported on the program's success rate, and the recidivism rate is low, around 1 percent. Morales testified program staffers keep tabs on graduates to ensure they continue on their paths, and staffers emphasize graduates will face challenges when

---

[11]    Guiding Rage Into Power (GRIP).

they go home so they need to stay involved in constructive programming, such as Narcotics Anonymous (NA), Alcoholics Anonymous (AA), or therapy.

Morales testified he has kept in touch with C.S, and he described C.S. as highly intelligent, honest, articulate, and mature, with excellent writing skills. C.S. was one of the program's stars and he was prepared to do the deep, personal work the program required; he was able to handle difficult feedback well; he learned to manage or control his emotions by responding instead of reacting; and he took accountability. In Morales's opinion, based on C.S.'s record, behavior, and class responses, he is rehabilitated and he has the skills and support system to help him succeed. Morales testified C.S. is now an adult ready to face the challenges of being a "prosocial" citizen and is not the foolish, impertinent, impulsive young man he once was. In response to the juvenile court's question, Morales testified that C.S. is rehabilitated, but everyone is a work in progress, with continual improvement. Morales opined that C.S. is a safe man and will not act in a criminal manner, and that continued incarceration will not further advance his rehabilitation. Rather, any further advancement in rehabilitation will occur as a free person.

### 2) Uncuffed Project

Damon Cooke is the CEO of Uncuffed Project, a nonprofit that provides support and rehabilitation services and programs, both inside and outside of prison. He also runs the Cares Navigation Center for the Alameda County District Attorney's Office. Cooke testified he started Uncuffed Project in 2019, at which time he was incarcerated. At the time of his testimony, he directly supervised 124 people in transitional housing throughout multiple properties in Solano County. He explained the program receives referrals from the Department of Corrections and Rehabilitation (CDCR) and offers full wraparound services, including housing, medical, food, and employment training, and it partners with different agencies, including Workforce Development. The program also offers basic life skills, resume writing, GED education, restorative justice, and classes

14.

such as batterers intervention, domestic violence, drug and alcohol treatment, gang education, and anger management. In addition, Cooke provides gang education and other types of focus groups to those still incarcerated.

Cooke taught classes when he was still in prison, and he was involved in the Youth Offender Program. He became C.S.'s mentor when they were at Solano together and he spent four of his last five years in prison with C.S., beginning in 2015 or 2016. Cooke stated he knew C.S. well, he continued to be actively engaged with C.S., and they met weekly by phone. At Solano, they did intensive work on growth and development together, including understanding gang dynamics, what led C.S. to prison, and how the gang affected his decision making; and Cooke saw C.S. work through his issues, including defiance, which Cooke described as related to learning to take instruction and understanding prison hierarchy.

Cooke explained that rehabilitation involves both the willingness to change and a demonstration of change, and that C.S. is changing rather than just thinking about it, evidenced in part by his graduation from the GRIP program, which Cooke facilitated when he was in prison and he stated is not an easy program. However, for everyone, the work to stay clean, sober, and out of custody is ongoing, and that continued work keeps one aware and grounded. He explained people are much less likely to reoffend if they understand the nature of their offense and how they reached that point, and that understanding is key to assessing the likelihood of recidivating.

Cooke saw no indication C.S. was still involved with gangs and he did not believe C.S. would become involved with them again. With respect to C.S.'s possession of a cell phone, Cooke never saw C.S. with the hidden phone, but they talked about it after C.S. was written up. Cooke testified he was in prison for 31 years and having a cell phone cost him 15 years, so he openly spoke against engaging in such behavior. Once C.S. was disciplined for having the phone, he understood Cooke's position. Cooke observed C.S. to be remorseful and, together, they looked at the decisions C.S. made. C.S. was young

then and he learned from his bad decisions, he was willing to work on growth and development, and he had "matured tremendously." Cooke testified C.S. is no longer the person he was when they first met, he had taken ownership, and he was now the one giving advice.

In Cooke's opinion, C.S. has been rehabilitated, he is not a danger to the community, and he is ready for the next step, which is release from custody. Cooke explained that C.S. will need to reacclimate to life outside of prison, which will likely take five or six months and must occur before C.S. starts working or participating in group settings. That process will include education relating to trauma and learning to deal with situations involving gang members. Cooke testified that the Uncuffed Project has a standing bed waiting for C.S. and he is personally invested in C.S.'s success, based on the work they did together in prison and his belief C.S. can be a benefit to society and his culture once released. Cooke also testified he has employment opportunities available for C.S., and teaching gang education and awareness would be a perfect fit for C.S.

### 3)      C.S.

#### a)      Family Background

C.S. testified he was born in 1990 in a refugee camp in Thailand. His father and two sisters passed away there, and he came to this country with his mother and younger brother when he was two or three years old. They lived with his paternal grandparents, and his grandfather was physically, mentally, and emotionally abusive toward his grandmother, aunt, and mother. He recalled leaving with his mother in the middle of the night, and they moved numerous times between then and his incarceration.

C.S.'s mother had a succession of abusive boyfriends. He witnessed his mother being raped and beaten, and he was molested by an older sibling for a number of years. He loved school and after-school activities, which was an escape from his home life, but, in the summer of 2004, they moved to an area dominated by gangs. He told his mother he was being bullied and beaten up, but she blamed him and he learned not to depend on

16.

her and to suppress his emotions. After moving and beginning high school, he started using drugs and alcohol rather than school as an escape. He also lost his fear of gang members and began hanging out with them.

### b) Juvenile Commitments and Incarceration

In 2005, C.S. cut class with someone else, and they broke into a car and stole the radio to earn admiration from the gang. In April 2005, he was drunk and went to his girlfriend's house. She told him repeatedly to stop drinking and hanging out with bad people, and she finally broke up with him. He felt worthless and rejected so he began to cry and promised to change. Her family told him to leave and after her father and brother-in-law became physical, he threatened to call his homeboys and to kill them.

After he was arrested for making threats and released on an ankle monitor, he tried to talk to his mother, but she told him it was his fault. His fellow gang members, in contrast, praised him for being jailed and put on an ankle monitor. After he asked his mother for money and she said no, he became angry because he was used to getting his way and he punched the window. His stepfather called police and he was arrested for assault.

C.S. was committed to boot camp for five or six months, where he attended school and participated in marching and drills. With good behavior and leadership, he was promoted to sergeant major, but, after his release, older members of his gang were waiting for him when he arrived home. He was jumped into the Oriental Troops by three older gang members and given a handgun by them as a loyalty test, which led to a charge for firearm possession and another boot camp commitment. C.S. again excelled in boot camp and was granted early release.

In 2006, in the weeks preceding Trevino's shooting, C.S. was constantly drunk and high on marijuana. He was with a group when one of them began talking about having an altercation with Trevino. C.S. was the youngest one there and when the others

looked at him, he felt obligated to speak so he said he would take care of it to impress them.

Two weeks later, C.S. was hanging out at a house with a group, drinking and smoking marijuana. After the mother of the group member who lived there kicked them out, they started walking down the street and encountered Trevino, whom C.S. recalled was wearing red. When C.S. came within two or three feet of Trevino, he shot and killed him.

C.S. was arrested for the murder in October 2006. In 2007, sometime after Thanksgiving, he was talking to another juvenile through the ventilation system. That juvenile, who was also a gang member, slid a handcuff key under C.S.'s door. The juvenile had planned to escape, but changed his mind after he received a plea deal. C.S. talked with his two codefendants and the three agreed to give escape a shot.

In December 2007, the three were transported to court. When the door to the transport van was opened, they took off running. After becoming tired, they hid in a shed and were caught approximately 20–30 minutes after first fleeing.

C.S. did not recall receiving any drug or alcohol counseling in boot camp or the juvenile detention facility, and he did not recall receiving any mental health counseling or gang intervention at the juvenile detention facility. He earned his GED, or high school equivalency certificate, however, and was assigned to be a tutor.

After C.S. was convicted of murder several months before his 18th birthday, he was housed in a pretrial facility before being transferred to a reception center and then, in November 2008, to High Desert State Prison (HDSP), a level four maximum security prison. At HDSP, they were constantly on lockdown and there were no program opportunities. He asked for some kind of program during classification, but was told there was no self-help programming and he did not qualify for an education program because he had earned his GED. He was put on a waiting list for a job and then assigned to be a yard worker.

In March 2009, C.S. had a physical altercation with an older inmate who used to be his cellmate. C.S. testified the older inmate was a bully who made him uncomfortable, and C.S. alerted staff, who moved him. C.S. was then celled with an inmate his age, but whenever the two were on the yard, C.S.'s former cellmate would provoke them with derogatory slurs and aggressive gestures. This led to a physical altercation initiated by C.S. and his cellmate, and C.S. received a rules violation write-up, for which he lost privileges for 30–60 days. C.S. testified that throughout boot camp, juvenile hall, and prison, that was the only physical altercation he was in.

In 2011, C.S.'s request for a transfer to be closer to home was granted and he was transferred to Kern Valley State Prison, also a level four maximum security prison. He again asked for programs, but there were no self-help programs and he was not eligible for an educational program due to his GED. He asked to be put on the waiting list for a job and was subsequently assigned to be a building porter. He did not have any disciplinary issues and was transferred to level four medium custody at Corcoran State Prison for good behavior and positive programming.

There were still no programs available to C.S. and he was assigned as a yard worker. He was promoted to a correctional counselor's clerk, then to a lieutenant's clerk, and then to a sergeant's clerk. One year after he arrived, the administration informed the inmates they were going to incorporate programs. Inmates were assigned by racial group and C.S. was in the first group for his classification to be selected for a conflict resolution program. The next program to be introduced was called Lifer's Reaching Goal and he was one of the first to sign up for that program. He also began attending church services. An inmate who was set to be paroled told C.S. to "get right with [his] higher power" and he did so in May 2014. When C.S. was being baptized, he heard some other inmates commenting that people go to church when scared, but C.S. went because he was tired and he needed to stop running and face his pain. He started attending Bible study, NA, and AA. In the summer of 2005, when he was 25 years old, his classification score was

reduced due to positive programming and he was transferred to Wasco State Prison, a level three medium security prison.

At Wasco, C.S. again asked for program, education, and job opportunities. He was able to sign up for community college and was put on a job list. He continued with NA and AA, and he signed up for a gang intervention program. He ended up having to drop out of the community college classes he signed up for because he could not afford the books, but he began working around the prison as an electrician and he became involved in a program that assisted with coping skills. While at Wasco, C.S. was written up for overfamiliarity, resulting in his second prison write-up. He testified he was ashamed and embarrassed for the childish, immature, inconsiderate, disrespectful comment he made. He stated he has taken full responsibility and has taken classes to address his issues. Through victim awareness, he learned of the impact his statement had and he made changes to ensure he never victimizes anyone again.

C.S. was subsequently transferred to Solano, a level two minimum security prison. He was put on a waiting list for a job, but did not have priority since he was serving a life sentence. There was an educational program available and multiple self-help programs. He had taken almost all of them when the COVID-19 pandemic began. The classes and groups included anger management, childhood abuse and trauma, criminal thinking, batterers intervention, elements of change, lifers participation group, normal development and functioning, self-assessment for change, NA and AA, criminal gang members anonymous, criminal rehabilitation anonymous, conflict resolution, domestic violence, relapse prevention plan, cognitive behavioral treatment, victim's awareness, victim's impact, victim's voice, and stress management. He also began taking classes through Lassen Community College and Solano Community College.

In 2020, C.S. was transferred to Tracy. He was there for approximately one year. The prison was on lockdown the entire time due to the pandemic, but he managed to take five or six college classes. After that prison was closed, he transferred to SATF, a level

20.

two minimum security prison. It was overcrowded and scary, but he continued with his education and took some self-help correspondence classes. He was assigned first to a culinary job and then became a building porter. At the time of his testimony, he was assigned as an ADA worker assisting inmates with mobility impairments.

In 2022, at the time of his first transfer hearing, he needed one more class to obtain his associate's degree in English and he subsequently earned his degree. C.S. testified he is currently working toward his bachelor's degree in psychology, and he took multiple classes through Cognitive Behavior Intervention and the basic and advanced Alternative to Violence Project classes. He also graduated from GRIP, which he described as a deep, intensive program that helped him identify the factors underlying his problems and process his emotions in a healthy way. He signed up for a facilitating program and the regional manager told him that if he remains in prison, he will be the next cohort to become a facilitator. If he is released, he will be involved in getting a facilitating program started.

### c) Uncuffed Project and GRIP

C.S. testified that Cooke, with Uncuffed Project, is his sponsor. After he was caught with a cell phone at Solano in 2018, Cooke spoke with him about how he felt and what he learned. He testified he felt ashamed, embarrassed, and angry, and he learned that breaking any rule was not worth his recovery and rehabilitation. Cooke told him he was hurting not only himself but his victims, including Trevino, and C.S. agreed. C.S. testified he cried over the pain and suffering he caused, and Cooke was patient, helped him process his emotions and guided him on which classes to take to address his issues so he would not reoffend.

He testified he had the phone in prison to contact his mother and to play games and movies. He also contacted his old friends from the gang with the phone, but he said they were family men with jobs by that time. After getting caught with the phone, which constituted a relapse within the meaning of one of the programs he took and necessitated

21.

identifying the cause of the relapse, he took a cell phone program and, since 2018, he has not had any disciplinary issues or any contact with people from his gang. He also got his last gang tattoo in 2010, and he testified that although drugs and alcohol may be obtained in prison, he has not used either.

In the GRIP program, C.S. trained with Morales for eight or more hours per month. It was an intense program, and the two discussed sensitive topics, including "original pain." C.S. learned how to uproot trauma by identifying his problems, challenging and eradicating his beliefs, and replacing those beliefs with healthy behavior and habits.

C.S. testified he started to have a change of heart in 2010 or 2011, and he has been excited about opportunities to rehabilitate since his first exposure to a self-help program in 2013. He believes he has been rehabilitated. He has learned that rehabilitation and recovery through service and personal development is lifelong, and that one of his warning signs of relapse is stagnation, believing he is healed and cured. He testified he is very happy and has developed integrity, emotional intelligence, competence, self-dependence, and the ability to identify and immediately address stressors. He has also learned to develop personal relationships and make amends; he has developed his identity, including as a productive member of society; and he has a purpose, which gives him direction. C.S. testified he has plans to work with Cooke, bringing awareness to at-risk youth about gangs and the criminal lifestyle, and he is doing so not only for himself but in honor of the life he took. C.S. stated he is doing everything he can to give to the community, be a productive member of society, and ensure he never hurts anyone again.

### 4) Dr. McDonald

#### a) Evaluations

Dr. McDonald is a psychologist who specializes in evaluating and treating children in adolescence. She met with C.S. four times in 2022 and prepared a report that was submitted to the court prior to C.S.'s first transfer hearing, at which she also testified.

Prior to the second transfer hearing, McDonald met with C.S. twice for a total of six and one-half hours; she again administered tests for psychopathy and malingering, which were negative for any issues; and she reviewed material related to his accomplishments in prison. Dr. McDonald contacted the deputy chief probation officer and the division manager, both of whom represented they would send her documents pertaining to C.S.'s treatment while he was at the youth facility when he was 14 and 15 years old. However, she never received any documents or phone calls, which led her to presume there were either no documents or no available documents.

### b) C.S.'s Background

With respect to C.S.'s background, Dr. McDonald testified about the concepts of intergenerational trauma and epigenetics, which she explained occur when a mother passes on her own trauma to the developing child during pregnancy, impacting the child's genetics and resulting, for some children, in increased susceptibility to depression or anxiety and a lesser ability to respond to certain things. In C.S.'s case, his mother was an orphan from Laos and when C.S. was a toddler, as part of the process to relocate to this country, he and his parents crossed into Thailand to a refugee camp. The camp was filthy and disease-ridden, with frequent food and water shortages. C.S.'s two younger sisters died as a result of the conditions in the camp, and his father subsequently died there from a respiratory illness. C.S. came to this country with his mother, who was pregnant with his younger brother, and they lived with his paternal grandparents. His paternal grandfather was very abusive, however, and C.S. was exposed to the verbal and physical abuse his grandmother and mother received.

C.S.'s mother eventually left his grandparents' home around the time he was five years old, but she relied on a series of men for support, many of whom were abusive. As a result, C.S. witnessed his mother being physically abused and raped, and the family cycled through apartments, landing with relatives temporarily in between apartments. During this period, C.S.'s mother had one child with a man who took the child with him

when he left and she had a second child, who had disabilities, with another man. C.S.'s mother eventually met his stepfather, with whom she had two more children. Dr. McDonald described C.S.'s stepfather as a good man, but because he was disabled and the family relied on his disability income, they remained mired in poverty and continued to move around. Also during this period, C.S. was responsible for other children in the household, and sometimes even his stepfather, while his mother worked; he was molested by a cousin; and he was bullied during middle school.

When C.S. was about to start high school, the family moved to a neighborhood with gang activity. C.S. was a good student and a high achiever in high school, but once it became known he was smart, gang members began to search him out because they wanted him to join. He was offered drugs and alcohol, and his girlfriend broke up with him over his involvement with drugs, alcohol, and the gang. Gang members then "tutored him on the appropriate masculinity for a young Laotian man, which was to demand and argue and threaten and promise retribution if she did not return," resulting in the incident underlying the criminal threats he made against his girlfriend and her family. After her parents called the police, he was arrested. Once he sobered up and was released from juvenile hall, he and his mother argued when she took his girlfriend's side and he punched a window.

### c) Adolescence

Dr. McDonald testified concerning brain development in adolescents. She explained that brain changes begin at this time, and current research indicates that maturity begins to set in around the age of 25. The last areas of the brain to develop are decision making, risk taking, and impulse control. Additionally, male adolescents have excess testosterone, which increases risk taking and lessens sensitivity to emotional and physical pain.

When C.S. threatened his girlfriend and her family, he was an adolescent and was drunk and high, leading to an escalated situation. The situation was also complex

24.

because he had an intense relationship with his girlfriend, and he then wanted to be comforted and nurtured by his mother, but she did not approve of his behavior, leaving him angry and behaving irrationally. Dr. McDonald explained that at the time, C.S. was not able to process the corrective information his mother gave him. Much later, however, he processed the situation appropriately, understanding his behavior was unacceptable and frightened people. Years after the crime, he apologized to his former girlfriend.

Dr. McDonald had no concerns about public safety should C.S. be released from prison, and she opined that he was an appropriate subject for juvenile court. C.S. had not had any incident of violence since 2009, when he was at HDSP, and he would have been amenable to treatment, had his needs been diagnosed and treated at the time. Dr. McDonald testified that in her opinion, C.S. is rehabilitated and was probably rehabilitated as of 2015. She explained that rehabilitation is a process, which she defined as a "change in behavior for the better and a continu[ation] of that change," typically requiring that problems be recognized and addressed. She also agreed that being prosocial is a good descriptor of rehabilitation. Based on C.S.'s ability not only to change his behavior in boot camp, but to excel, Dr. McDonald was of the opinion that he began the process then, but rehabilitation often requires either removing people from a situation or providing support, structure, group processing, and therapy. However, other than structure while in boot camp, there is no record C.S. was provided with anything as a juvenile and when he was released, the gang was there waiting for him. Had C.S. been offered rehabilitative opportunities as a minor, Dr. McDonald believed he would have been rehabilitated prior to the expiration of the juvenile court's jurisdiction.

Dr. McDonald explained that the harm C.S. caused cannot be undone and factors like family trauma, emotional difficulties, drug use, and absence of treatment do not alter culpability, but they must be addressed through treatment. C.S. was able to start focusing on those underlying factors and rehabilitating himself. Dr. McDonald described the

25.

change in C.S. as "pretty dramatic" and "somewhat unusual," and she stated she had not had another case like this.

In her opinion, possession of the cell phone and overfamiliarity with a staff member were not red flags with respect to C.S.'s rehabilitation. Rather, possession of the cell phone was an example of criminal thinking, but C.S. realized it was a slip or a small break, and she likened it to when an alcoholic has a small break. Red flags for Dr. McDonald would be things like drug use or violent behavior. The failure to take responsibility would also impact her assessment of whether someone was rehabilitated. However, C.S. had not brushed off his killing of Trevino.

In response to questions from the juvenile court concerning ongoing rehabilitation, Dr. McDonald testified that C.S. had created a parole plan, which was before the court and detailed his needs for a halfway house, a sponsor, and certain services. Dr. McDonald did not disagree with anything in C.S.'s plan, and she said he would need to continue with substance abuse and gang awareness programs, and to obtain individual therapy. In her opinion, there were probably more services available to him in a public setting than in continued detention.

### 3. Other Evidence

The juvenile court took judicial notice of the court file, and the parties stipulated to the admission of the trial transcript and the transcript from the first transfer hearing, but the court did not have before it the evidence or the stipulations from the first transfer hearing. The record included a probation report from August 2024 and a probation report from September 2024, the latter updated following an interview with C.S. The court also considered Dr. McDonald's 2022 and 2025 reports, and exhibits submitted by C.S., including a 2015 report prepared by Dr. Weinstein, a clinical and forensic neuropsychologist. Dr. Weinstein's report concluded, in part, that because C.S. has good internal controls, "he can function well without the prison structure" and "does not represent future danger to the community in spite of his past history."

26.

### 4.     Juvenile Court's Ruling

The juvenile court considered the five factors set forth in section 707, subdivision (a)(3)(A) through (E).  The court found that three factors favored transfer to criminal court:  the degree of criminal sophistication, C.S.'s previous delinquent history, and the circumstances and gravity of the offense.  (*Id.*, subd. (a)(3)(A), (C), (E).)  However, the court found two factors weighed against transfer to criminal court:  whether C.S. can be rehabilitated prior to the expiration of juvenile court jurisdiction and previous attempts by the juvenile court to rehabilitate C.S.  (*Id.*, subd. (a)(3)(B), (D).)  The court concluded that the prosecution did not meet its burden of proving, by clear and convincing evidence, that C.S. "is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (*Id.*, subd. (a)(3).)

## C.     Claims of Error

### 1.     Decision in *C.S.* and Scope of Remand Order

As an initial matter, we address our decision and remand order in *C.S.* given the People's arguments that the juvenile court misunderstood our decision and that we limited the scope of the transfer hearing.  After an appellate court resolves an appeal and the time has passed for the Supreme Court to grant review, the appellate court issues "a remittitur to remit the appellate court judgment to the trial court, to divest the appellate court of further jurisdiction, and to transfer jurisdiction back to the trial court."  (*People v. Awad* (2015) 238 Cal.App.4th 215, 223, citing rule 8.272; accord, *People v. Saunoa* (2006) 139 Cal.App.4th 870, 872.)  "'Remittitur transfers jurisdiction back to the inferior court so that it may act upon the case again, consistent with the judgment of the reviewing court.'"  (*Awad, supra*, at p. 223, quoting *Gallenkamp v. Superior Court* (1990) 221 Cal.App.3d 1, 10; accord, *Saunoa, supra*, at p. 872.)  "'[T]he terms of the remittitur define the trial court's jurisdiction to act.  "The order of the appellate court as stated in the remittitur, 'is decisive of the character of the judgment to which the appellant is entitled.'"'"  (*People v. Hargis* (2019) 33 Cal.App.5th 199, 204, quoting

27.

*Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 774, fn. 5.) However, a remand order is not "a straitjacket" (*Hargis, supra*, at p. 207), and "[t]he scope of the superior court's jurisdiction as defined by a remittitur does not prevent the retroactive application of ameliorative laws" (*People v. Lopez* (2025) 17 Cal.5th 388, 396; accord, *Hargis, supra*, at p. 208).

### a. *C.S.*

First, we disagree with the People's contention that the juvenile court misunderstood our decision in *C.S.* In *C.S.*, we vacated the juvenile court's order granting the People's transfer motion and remanded the matter for a new hearing in light of posthearing amendments to sections 607 and 707, which applied retroactively. (*C.S., supra*, F085426.) In doing so, we stated, "C.S. is entitled to remand for a new transfer hearing that comports with the law as it now stands," we concluded the record did not indicate "the prosecutor or the juvenile court appreciated the full scope of the changes effected by Assembly Bill 2361," and we noted that Senate Bills 545 and 135 effected additional changes relevant to the adjudication of a transfer motion. (*C.S., supra*, F085426.) (See *People v Lynch* (2024) 16 Cal.5th 730, 774 ["'"[a] court which is unaware of the scope of its discretionary powers [cannot] exercise that 'informed discretion'"'"].)

We find no support in the record for the People's view that the juvenile court failed to apprehend this decision, or that the court felt constrained to avoid relying on the same reasoning Judge Loza did when he granted the motion at the first transfer hearing. At the second transfer hearing, Judge Hanna stated, "Probation opines that, because [C.S.] cannot be housed in the Juvenile Detention Facility[,] … he is not amenable to treatment before the expiration of juvenile jurisdiction. Such reasoning alone would negate the very essence of Senate Bill 135, which effectively was the same reasoning that Judge Loza utilized that was found to be in error." We separately address the merits of the People's argument concerning the lack of available programs below, but we interpret

28.

Judge Hanna's comment as recognizing, one, that we vacated Judge Loza's order and remanded the matter for another hearing given C.S.'s entitlement to benefit from retroactive changes in the law that became effective after the first hearing and, two, that the prosecution's argument effectively nullified Senate Bill 135's extension of juvenile court jurisdiction to include adults such as C.S. (See *Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 ["An interpretation that renders statutory language a nullity is obviously to be avoided."].) We will not presume error (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; accord, *Flores v. Department of Corrections & Rehabilitation* (2014) 224 Cal.App.4th 199, 204 (*Flores*)), and we are unpersuaded that the record indicates Judge Hanna misunderstood the decision in *C.S.*

During oral argument, the People took the position that Judge Hanna's comment concerning error by Judge Loza was not isolated and when viewed in the context of the ruling in its entirety, it is clear the court misapprehended the law. The People direct us to the facts that Judge Hanna mentioned reviewing multiple remittiturs and voiced her discomfort with the ruling she made. Neither point aids the People. The court referenced multiple remittiturs when taking judicial notice of the court file, including the two remittiturs pertaining to juvenile transfer hearings, and commented it "combed through the different remittiturs" in noting the significant change in the law between the first remittitur and the second remittitur. The record is clear that the court focused, correctly, on the remittitur in *C.S.* as the operative remittitur and directed the parties to focus on the operative remittitur.

With respect to the court's expression of discomfort, the court stated, in full, "that it has significant discomfort with this ruling. The Court may not agree, but is absolutely obligated to follow the law. The Court finds [C.S.'s] actions abhorrent. A jury has spoken. And overall, this Court has discomfort in overturning a jury's finding. But here the Court is obligated to analyze the five criteria, determine whether the People have met their burden, and ultimately determine the final question and whether or not the People

29.

have met that burden by clear and convincing evidence. Despite the Court's significant discomfort, the Court is obligated to follow the rule of law." It is unclear to this court why the People believe this expression of discomfort with the change in the law supports their position that the court misapprehended the law. To the contrary, these comments evidence the court's understanding that the law has changed and, irrespective of the court's view of those changes, the court is obligated to follow the law.

### b. Scope of Transfer Hearing

Second, we disagree that *C.S.* limited the scope of the second transfer hearing. Notably, in making this argument, the People rely on the language from our disposition in *See III*, but *C.S.* is the operative opinion with respect to the second transfer hearing, as stated. *See III* involved a remand under Proposition 57, and, therefore, the case was returned to the juvenile court with an instruction drawn from *Lara*, in which the California Supreme Court found that Proposition 57 applies retroactively and approved of the remedy articulated by the appellate court in *Vela I*.[12] (*See III, supra*, F079261; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 309–310 (*Lara*).) As the decisions in *Lara* and *See III* predated the legislative changes now in effect by several years,

---

[12] *Lara* expressed approval of the following remedy: "'Here, under these circumstances, Vela's conviction and sentence are conditionally reversed and we order the juvenile court to conduct a juvenile transfer hearing. (§ 707.) When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction. (§ 707, subd. (a)(1).) If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he is "not a fit and proper subject to be dealt with under the juvenile court law," then Vela's convictions and sentence are to be reinstated. (§ 707.1, subd. (a).) On the other hand, if the juvenile court finds that it would *not* have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion.'" (*Lara, supra*, 4 Cal.5th at p. 310, quoting *People v. Vela* (2017) 11 Cal.App.5th 68, 82 (*Vela I*) [review granted & transferred back in *People v. Vela* (Feb. 28, 2018, S242298), with instructions to vacate opinion & reconsider in light of Senate Bill 620]; see *People v. Vela* (2018) 21 Cal.App.5th 1099, 1102 (*Vela II*) [vacating *Vela I* and reconsidering matter].)

neither case could have spoken to, let alone conducted a statutory analysis of, the legislative changes at issue in *C.S.* (*People v. Brooks* (2017) 3 Cal.5th 1, 110 (*Brooks*) ["It is axiomatic that a case is not authority for an issue that was not considered."].) C.S. was entitled to a new transfer hearing on remand, governed by current law. We did not reach the merits of any past or future transfer hearing issues given C.S.'s entitlement to retroactive application of several changes in the law, and we did not limit the scope of the future hearing. (See *People v. Miracle* (2018) 6 Cal.5th 318, 337 ["'We will not … adjudicate hypothetical claims or render purely advisory opinions.'"]; *People v. Buza* (2018) 4 Cal.5th 658, 693 ["We … abide by … a '"cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more."'"]; *People v. Mosley* (2015) 60 Cal.4th 1044, 1054–1055, fn. 7 ["true adherence to judicial restraint and economy counsels against an unnecessary detour into an analysis of … statutory meaning [on an issue not before the court]."].) Therefore, we find the People's reliance on the language in *See III* as binding the juvenile court on remand in *C.S.* misplaced.

### 2. Conflation of Jurisdictional and Program Availability Issues

Next, the People claim the juvenile court erred when it conflated its jurisdiction over C.S. for up to two years with the unavailability of any rehabilitative programs in Tulare County, as summarized in the probation report. The People argue that the defense experts failed to demonstrate there were any facilities available that would address the probation department's concern over its inability to sanction C.S. for noncompliance. During oral argument, they urged that the juvenile court failed to fully appreciate the probation department's concern that it lacked any enforcement mechanism over C.S. and that the court would have reached a different conclusion were it not for this error.

Although the People acknowledge in their opening brief that they bear the burden in moving to transfer C.S. to criminal court, their arguments—in the lower court, in appellate briefing, and during oral argument—suggest otherwise. "The prosecution bears

the burden of proving by clear and convincing evidence that the minor is 'not amenable to rehabilitation while under the jurisdiction of the juvenile court'" (*Miguel R., supra*, 100 Cal.App.5th at p. 167, quoting § 707, subd. (a)(3)), which requires "a global assessment of the minor's suitability to rehabilitation within the juvenile court system" (*Miguel R., supra*, at p. 167).  The second of the five factors considers "'[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction'" (*id.* at p. 166, quoting § 707, subd. (a)(3)(B)(i)), and the focus of this factor "is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction" (*Miguel R., supra*, at p. 166).

In evaluating this second factor, the probation report stated, "Due to his age, [C.S.] is no longer amenable to juvenile services as the Probation Department has no services available to hold him further accountable for his actions.  [C.S.] does not meet the criteria for the [secure youth treatment facility] Program due to his age and placing him on [secure youth treatment facility] Step-Down would give the Probation Department no authority to recommend further sanctions should he fail to comply."  However, this bare, unsupported opinion does not constitute substantial evidence that C.S. is not amenable to rehabilitation while under the jurisdiction of the juvenile court.  (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1288 (*S.S.*).)  In contrast with the defense, which introduced evidence supporting its position that C.S. is rehabilitated and does not present a danger to the community in the form of testimony by Cooke, Morales, Dr. McDonald and C.S., as well as the prior report by Dr. Weinstein, the prosecution did not adduce any evidence supporting its contrary position.  As appellate courts have explained, the opinion of a probation officer in a report has no evidentiary value where that opinion is not supported by substantial evidence.  (*Ibid.*, citing *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 722.)  While Cooke discussed the transitional housing, comprehensive services, and rehabilitative programs offered by his nonprofit organization, and he testified he has a bed and a job waiting for C.S., the probation report does not include any information

32.

specific to C.S.'s rehabilitation and does not address the availability of rehabilitative services such as those offered by the Uncuffed Project.

To the extent the People disagreed with any aspect of the defense's evidence—such as whether C.S. was rehabilitated, whether he posed any risk to the community, whether there were deficiencies with the services or plan offered by Uncuffed Project, or whether the detailed parole plan C.S. had prepared was lacking—it was incumbent on the prosecution to offer evidence supporting its view. The People fault the juvenile court for failing to address the lack of available programs for C.S. in Tulare County, but they offered only conclusions and arguments unsupported by evidence. "[T]he changes to section 707 refocus juvenile courts on minors' amenability to rehabilitation" (*S.S., supra*, 89 Cal.App.5th at p. 1288), and, therefore, "analysis of the five criteria set forth in the statute should be focused through the lens of amenability to rehabilitation" (*ibid.*). "[P]roper analysis of [the second] criterion generally requires 'expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.'" (*Id.* at p. 1291, quoting *J.N. v. Superior Court, supra*, 23 Cal.App.5th at p. 722.) As in *S.S.*, "[t]he prosecution here presented no evidence to demonstrate what [C.S.'s] rehabilitative needs were, much less why they could not be met within the juvenile court's jurisdiction." (*S.S., supra*, at p. 1291.)

In addition, neither the probation report nor the People acknowledge the statutory change to section 875, which, effective July 10, 2023, provides, "A person who is 25 years of age or older shall not be committed to or detained in a county juvenile facility, unless the court finds that such a commitment or detention is in the best interest of that person and does not find that it would create a risk to the other youth in the juvenile facility. A juvenile court exercising jurisdiction over a person who is 25 years of age or older may order commitment or detention of the person into an adult facility, including a jail or other facility established for the confinement of adults, or into a less

restrictive program, as defined in subdivision (f), if the person is otherwise eligible for that program." (*Id.*, subd. (j) [added by Sen. Bill No. 134 (2023–2024 Reg. Sess.) ch. 47, § 30].) Counsel is presumed to know the law (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1123–1124; *People v. Barrett* (2012) 54 Cal.4th 1081, 1105), so the failure to account for a change in the law that appears to directly address the concern expressed by the People in the juvenile court and on review is of concern.[13]

In short, the People have not shown that the juvenile court misunderstood or misapplied the law with respect to either the second factor under section 707, subdivision (a)(3)(B)(1), or its overall finding under section 707, subdivision (a)(3). The People bore the burden of proof as to each of these issues. While the defense put on evidence that C.S. is rehabilitated, is not a danger to the community, and has a bed and a job waiting for him in a program that provides rehabilitative services, the People did not introduce any contrary evidence. Instead, they relied on a conclusory statement in the probation report that was not only unsupported and failed to address the substance of the issues, but failed to account for any programs or oversight available following the amendment of section 875. Therefore, we reject the People's argument that the juvenile court erred by conflating jurisdiction over C.S. with the unavailability of rehabilitative programs.

### 3. Failure to Apply Correct Legal Standard

Finally, the People argue the juvenile court abused its discretion by applying the wrong standard. As we interpret their briefing argument, the People posit that by virtue of the remand language in *See III*, this court limited the scope of the transfer hearing to the question of whether C.S. was amenable to rehabilitation while under the jurisdiction of the juvenile court, had the People brought a transfer motion when C.S. was 16 years

---

[13] At the disposition hearing, which has yet to occur, the juvenile court will have the ability to "'impose a wide variety of rehabilitation alternatives ….'" (*Lara, supra*, 4 Cal.5th at p. 306.)

old.  The People reason that the length of time it has taken to rehabilitate C.S., who is not yet fully rehabilitated even now, far exceeds what would have then been the length of the juvenile court's jurisdiction.  The People argue the juvenile court's focus on whether C.S. is amenable to rehabilitation while under the jurisdiction of the court for an additional two years "undermines th[is] retroactive scope" of the transfer hearing and was, therefore, error.

As the party seeking relief from the juvenile court's order, the People bear the burden of demonstrating error.  (*Flores, supra*, 224 Cal.App.4th at p. 204.)  "The judgment appealed from is presumed correct.  [Citation.]  The appellant must challenge it by 'rais[ing] claims of reversible error or other defect [citation], and "present[ing] argument and authority on each point made."'  [Citation.]  'This means that an appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test his claim.'  [Citation.]  'It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness.'"  (*Ibid.*)

The question at the heart of the People's claim is whether the juvenile court erred when it considered whether C.S. *is* amenable to rehabilitation while under the jurisdiction of the juvenile court for a period of up to two years from disposition rather than restricting the focus to whether C.S. *would have been* amenable to rehabilitation, had the transfer motion been filed in juvenile court at the outset, when C.S. was 16 years old. Resolution of that question requires statutory interpretation, to which well-established principles apply:  "[T]he language used in a statute or constitutional provision should be given its ordinary meaning, and '[i]f the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).'"  (*People v. Valencia* (2017) 3 Cal.5th 347, 357 (*Valencia*), quoting *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  Courts "generally must 'accord[]

35.

significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and … '[a] construction making some words surplusage is to be avoided.'" (*Valencia, supra*, at p. 357, quoting *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.) "'[T]he words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.'" (*Valencia, supra*, at p. 357, quoting *Dyna-Med, Inc., supra*, at p. 1387.)

However, rather than advancing any analysis of sections 607 and 707 as amended by Senate Bill 135 and Assembly Bill 2361, the People base their argument solely on a parsing of the remedy language from *Lara*. As previously explained, *See III* was not the operative opinion on remand and we did not limit the scope of the transfer hearing in *C.S.* Reliance on the language from *Lara* does not assist the People in meeting their burden of demonstrating error because """language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered."'" (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155 (*Knoller*); accord, *Brooks, supra*, 3 Cal.5th at p. 110.) Thus, a "'decision is … authority … only "for the points actually involved and actually decided"'" (*Knoller, supra*, at p. 155), and *Lara* is necessarily limited to the determination that Proposition 57 applies retroactively under *Estrada* and to the approval of a remedy in that situation (*Lara, supra*, 4 Cal.5th at pp. 309–310 & 313).[14] Notably, *Lara* could not have spoken to the issues in

---

[14]    "The *Estrada* rule only answers the question of *whether* an amended statute should be applied retroactively. It does not answer the question of *how* that statute should be applied." (*People v. Stamps* (2020) 9 Cal.5th 685, 700.) *Lara* acknowledged that with respect to retroactive application, "the appropriate remedy can be somewhat complex" (*Lara, supra*, 4 Cal.5th at p. 313), but "potential complexity in providing juveniles charged directly in adult court with a transfer hearing is no reason to deny the hearing" *(ibid.)*. Nothing in *Lara* purports to bind courts interpreting other issues within the context of transfer hearings or interpreting

36.

this case given it predated the relevant statutory amendments by several years. In the absence of any statutory analysis by the People directed to sections 607 and 707 as amended, we decline to comment further on the *Lara* remedy, but we observe that *Lara* was not a cold case and instead involved a petition for writ of mandate filed by a minor who was charged in criminal court only five months prior to the passage of Proposition 57.[15]

"[F]ailure to offer reasoned analysis of [an] issue constitutes a waiver. ""When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."""" (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1008, italics omitted; accord, *Perry v. City of San Diego* (2021) 65 Cal.App.5th 172, 188, fn. 8 ["It is not this court's role to connect the dots."]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties."]; see rule 8.204(a)(1)(B).) The People's failure to develop a legal analysis that is tethered to the issue they raised and is supported by relevant authority compels rejection of their claim of error. We will not develop that analysis for them.

It nevertheless bears emphasis that in stating the People had the burden of proving, by clear and convincing evidence, that C.S. "is not amendable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707, subd. (a)(3)), a period not to exceed

---

entirely different changes in the law. (*Brooks, supra*, 3 Cal.5th at p. 110; *Knoller, supra*, 41 Cal.4th at pp. 154–155.)

[15]     Nor was *Vela I*, which set forth the remedy approved in *Lara*, a cold case; charges were filed against Vela in criminal court for crimes he committed as a 16-year-old minor and Proposition 57 passed while his direct appeal following conviction was pending. (*Vela II, supra*, 21 Cal.App.5th at p. 1102.) During oral argument, the People also cited *S.S.* as supportive of their position on this issue, but *S.S.* was decided in March 2023, prior to the amendment of section 607 by Senate Bill 135, and it, too, did not involve a cold case. (*S.S., supra*, 89 Cal.App.5th 1277.)

two years from the date of disposition given C.S.'s age (§ 607, subd. (d)), the juvenile court relied on the plain language of section 707 as amended by Assembly Bill 2361 and section 607 as amended by Senate Bill 135.  (*Valencia, supra*, 3 Cal.5th at p. 357; accord, *People v. Prudholme* (2023) 14 Cal.5th 961, 975–976 (*Prudholme*).)  The juvenile court specifically recognized that the People's hearing argument disregarded the amendment to section 607 by Senate Bill 135, which provided for jurisdiction over persons 25 years or older.  (See *J.S., supra*, 105 Cal.App.5th at p. 212 ["[t]he ultimate question for the juvenile court in a transfer petition is whether a minor is amenable to rehabilitation *before the juvenile court's jurisdiction expires*" (italics added)]; *Miguel R., supra*, 100 Cal.App.5th at p. 166, italics added ["[T]he focus of the second criterion is whether there is enough time to rehabilitate the minor *while the minor is still eligible to remain under juvenile court jurisdiction*."].)

Further, in amending Senate Bill 135 on August 28, 2023, to add subdivision (d) to section 607, the committee report stated the bill "[c]larifies jurisdiction for juvenile courts in cases where a person committed a serious crimes as a minor, but is now over 25 years of age, which may arise due to resentencing efforts or cold cases, among other reasons."  (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill. No. 135 (2023–2024 Reg. Sess.) Sept. 8, 2023, p. 3.)  Despite this, the People do not attempt to reconcile their argument with the Legislature's amendment of section 607 to expressly provide for juvenile court jurisdiction of up to two years in cases like this.  (See *Prudholme, supra*, 14 Cal.5th at p. 975 ["'We examine [statutory] language, not in isolation, but in the context of the statutory framework as a whole to discern its scope and purpose and to harmonize the various parts of the enactment.'"].)  Additionally, the People's argument is divorced from the clear shift in the law that has taken place over the past decade plus, which provides the backdrop for the recent legislative changes at issue. (*Valencia, supra*, 3 Cal.5th at pp. 357–358; see e.g., *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88, 89, 100–102 [there has been "'a sea change in penology regarding the

relative culpability and rehabilitation possibilities for juvenile offenders, as reflected in several judicial opinions.' [Citation.] These changes were based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences. [Citations.] In the same period, the California Legislature enacted numerous reforms reflecting a rethinking of punishment for minors."]; *S.S., supra*, 89 Cal.App.5th at p. 1284 [Assem. Bill 2361 was "intended to address recent developments in law and new scientific research regarding juveniles"]; *People v. Nash* (2020) 52 Cal.App.5th 1041, 1081 [recognizing "there has been a sea change in the law, procedurally and substantively, with respect to juvenile offenders (*Montgomery v. Louisiana* (2016) 577 U.S. 190 [136 S.Ct. 718, 734–735]), grounded in the recognition that children differ from adults because of their '"diminished culpability and greater prospects for reform"' (*id.* at p. 733)."].)

In conclusion, the juvenile court adhered to the statutory language when it concluded that the People did not demonstrate, by clear and convincing evidence, that C.S. is not amenable to rehabilitation while under the jurisdiction of the juvenile court, which is up to two years from disposition. (§§ 707, subd. (a)(3), 607, subd. (d).) For the reasons discussed, the People have not shown this to be error. Tellingly, the People do not advance a claim that the court's ruling is unsupported by substantial evidence, and as our factual summary reflects, the prosecution failed to offer any expert evidence that C.S. is not amenable to rehabilitation or any evidence that otherwise meaningfully countered the evidence offered by the defense.

The People have not shown entitlement to relief from the juvenile court's order and their petition is denied.

## DISPOSITION

The order to show cause is discharged and the petition for writ of mandate is denied.

                                                                    MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.